(Nos. 12231-12232.—Judgments affirmed.)

SIDNEY S. GORHAM et al. Appellees, vs. THE MASSILLON IRON AND STEEL COMPANY, Appellant.—WILLIAM H. KIDSTON, Appellee, vs. THE MASSILLON IRON AND STEEL COMPANY, Appellant.

*Opinion filed October 21, 1918.*

1. GARNISHMENT—*basis of garnishee's right to withhold money or property.* The right of a garnishee to refuse to turn over money or property to the person for whom he holds it is based wholly on the theory that he has a right to protect himself and escape from incurring liability which in fairness and justice he ought not to incur.

2. SAME—*when corporation garnishee has no right to refuse to transfer stock.* A corporation which procures the institution by certain banks of attachment suits against a stockholder upon an indebtedness for which the corporation is primarily liable and against which it had agreed to hold the stockholder and his estate harmless, has no right, though named as garnishee, to refuse to transfer shares of stock to an assignee of the stockholder upon demand.

3. TROVER—*when corporation is guilty of conversion of stock.* Where a corporation, by procuring the institution of attachment suits against a stockholder, seeks to obtain a sale of the latter's stock for its own benefit, and, though having knowledge of an assignment of the stock by the stockholder, fails to disclose that fact to the court in its answer as garnishee and refuses to transfer the stock on demand of the assignee, it is guilty of a willful and malicious conversion of the stock.

4. SAME—*what is a proper method of proving value of stock.* Where the stock converted by a corporation had no market value at the time of the conversion, it is proper, in proving its actual value, to show the value of the assets of the corporation, the amount of its liabilities and its earning power for a number of years prior to the conversion.

5. SAME—*when tender of stock is of no avail.* Where the conversion of stock by a corporation is willful and malicious and part of a scheme for obtaining the stock of a stockholder whom the corporation has involved in litigation, a tender of the stock to the assignee of the stockholder after the litigation has terminated against the corporation is of no avail either as a defense to a suit in trover or in mitigation of damages.

APPEAL from the First Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. OSCAR E. HEARD, Judge, presiding.

VICTOR ELTING, and WALTER L. FISHER, (FISHER, BOYDEN, KALES & BELL, of counsel,) for appellant.

AMOS C. MILLER, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

Sidney S. Gorham and Henry W. Wales, appellees, brought their suit in trover in the superior court of Cook county against the Massillon Iron and Steel Company, a corporation, appellant. William H. Kidston, appellee, brought a like suit against the appellant in the same court. The cases were tried together before the court without a jury, it being stipulated that the same evidence should apply to both cases. Judgment was rendered in favor of Gorham and Wales for $35,700 and in favor of Kidston for $30,851. On appeal to the Appellate Court for the First District these judgments were affirmed, and certificates of importance having been granted, the causes have been brought here for further review, where they have been consolidated.

The evidence taken was voluminous, but the essential facts, briefly stated, are as follows:

The appellant company is a corporation organized under the laws of the State of Ohio and having its plant and principal place of business at Massillon, Stark county, Ohio. It has maintained since its organization a sales office in the city of Chicago, through which most of its products have been sold. The company was organized through the efforts of Frank F. Fisher, C. M. Russell and H. A. Croxton. The Chicago office until March 21, 1912, was in charge of Fisher, then vice-president of appellant and also its sales manager. At the time of the organization of appellant Fisher sub-

scribed for, and there were set apart for him, 325 shares of stock. In July, 1905, appellant set apart for Fisher 145 additional shares of stock, for which he gave his notes to the company aggregating $14,500, the par value of the stock. These notes were discounted by appellant and distributed among four banks of Massillon. In June, 1910, the defalcation of $200,000 of H. A. Croxton, president of appellant, was discovered, which precipitated a crisis in the affairs of the company. At that time Fisher's holdings amounted to 1575 shares of stock. On August 4, 1910, appellant agreed to take up Fisher's notes and return them to him, in consideration of which he was to return a corresponding amount of stock held by him to appellant. Later this agreement was made a matter of record by appellant, the agreement being, in substance, that whenever appellant should be in a position to take up the outstanding Fisher notes which appellant had indorsed it would do so and would surrender the same on return of a corresponding amount of stock, and that appellant would, on receipt of the proper amount of stock, enter into an agreement to hold Fisher and his estate harmless against the notes indorsed by the company then outstanding and given for stock of appellant, and that, pending the taking up of the notes outstanding, Fisher should renew the same as required. Pursuant to this arrangement, in September, 1910, Fisher delivered all of his stock certificates to appellant, and appellant took out and retained 210 shares as the amount of stock to be surrendered by Fisher to cover the notes in question. The balance of 1365 shares was returned to Fisher. Thereafter efforts were made to reorganize the company, whereupon a difference of opinion arose between Fisher and the other stockholders as to the proper method to be pursued, Fisher objecting to the plans proposed by the other stockholders. In November, 1911, Russell, who was then president of appellant, refused to be bound by the agreement entered into to take up the Fisher notes, but appellant still retained the 210 shares of stock

surrendered by Fisher. At a meeting of the stockholders held for the purpose of agreeing to a plan of re-organization, held on March 14, 1912, Fisher incurred the displeasure of Russell and other stockholders by his opposition to the proposed plan. Realizing that he was about to become involved in litigation because of this divergence of opinion, on March 15, 1912, Fisher sold and transferred 1350 shares of the stock held by him to appellee Kidston, and Kidston transferred 700 of these shares to appellees Gorham and Wales. Appellant contends that these sales and transfers were without proper and adequate consideration. This left Fisher holding 15 shares of stock. On the following day Russell discharged Fisher as sales manager, and the Massillon banks, at the request of Russell, began demanding of Fisher that he pay the notes held by them. On March 19, 1912, at the request and direction of Russell, president of appellant, two of the Massillon banks instituted attachment suits against Fisher in Stark county, Ohio, and garnisheed appellant. On March 25, 1912, Gorham, as one of the attorneys for Fisher, wrote appellant disclosing that Fisher no longer owned the stock, and on March 30, 1912, appellant wrote Fisher stating that its treasurer would send him a statement of its account against him, and that "it was expected that you would settle this by turning in Massillon Iron and Steel Company stock at an agreed valuation. You have failed to do this, and, as we have been informed by your attorney, no longer have stock. Payments from this source being no longer possible, it remained for us to apply money due you on the account, and it was so ordered by the directors." On April 18, 1912, appellant filed its answers as garnishee in the suits begun March 19, in which it stated that 1575 shares of appellant's stock stood in Fisher's name. In this answer appellant stated nothing concerning the fact that Fisher had disposed of or transferred any of his stock or had surrendered 210 shares to appellant in satisfaction of his liability on these notes. On April 20 the other two Massillon banks,

at the request of appellant, brought attachment suits on the remainder of the Fisher notes and garnisheed appellant. April 26 a representative of appellees made two demands on appellant for the transfer of 1350 shares of stock from Fisher to appellees. The first demand was refused on the ground that the company's books were in the city of Cleveland, Ohio, and the second was refused on the ground that the books had been closed pending the holding of a stockholders' meeting. On April 30 a third demand for the transfer of the stock was made, which was refused on the ground that the company had been garnisheed in the attachment suits above mentioned.

In the meantime a plan of re-organization was finally agreed upon which involved the increasing of the capital stock in the sum of $490,000, $225,000 of which was to be first preferred stock and $265,000 second preferred stock. Under this plan of re-organization unsecured creditors of the company (which included the banks holding the notes in question) were to surrender their claims and were to receive in lieu thereof second preferred stock of appellant. On May 15, 1912, each of the banks which held the notes of Fisher, aggregating $14,500, and which had previously started the four attachment suits and garnisheed appellant, accepted from appellant its second preferred stock to the amount of the indebtedness represented by those notes. This stock was accepted under an agreement entered into between appellant and the banks, respectively, which agreement was reduced to writing on September 28, 1912. The cashier of one of these banks testified that his bank received the second preferred stock in payment of the note held by it and that from that time the bank had no further interest in that note; that his recollection was the bank then turned the note over to appellant; that thereafter the bank did not carry the note as an asset but carried the second preferred stock at its par value on its books and in its financial statements. The written agreement later entered into be-

tween appellant and the respective banks in reference to this transaction were identical and in substance were as follows: The bank received from appellant a designated number of shares of its second preferred capital stock as security for the liability of appellant on the Fisher note, which was indorsed by appellant, and the bank agreed with appellant, in consideration of the giving of said security, that it would collect as much as possible of the principal and interest due on the note from Fisher and would thereupon return to appellant so much of said second preferred stock at its par value as should equal the net sum so collected from Fisher, and at the option of appellant the bank would accept the balance of said designated number of shares of said second preferred stock in full payment of the balance of the amount due it as evidenced by said note, and would thereupon indorse and deliver the note to appellant and assign to it any and all judgments that should be taken thereon. After the cashier above mentioned had testified that his bank no longer had any interest in the note after receiving the second preferred stock, he was shown a copy of the agreement entered into by his bank and was asked whether he desired to make any addition to or correction of his testimony, and he replied that he did not. Appellant's balance sheet on May 13, 1912, showing its financial condition, did not disclose any indebtedness to banks. On June 1, 1912, appellant filed answers as garnishee in the attachment suits started April 20, 1912, in which it stated that 1365 shares of stock stood in Fisher's name.

On August 6, 1912, Fisher, not knowing of the transaction of May 15, 1912, whereby second preferred stock of appellant had been assigned to the Massillon banks in payment of the notes held by them, instituted a suit in equity in the common pleas court of Stark county, Ohio, against appellant and the four Massillon banks, alleging that the notes which the banks held had been executed by him for the accommodation of appellant without consideration and

praying that appellant be directed to pay the notes. The banks filed a formal answer, alleging that they were the owners of the notes in due course and that the same were unpaid. Appellant answered denying Fisher's allegations and alleging that Fisher was the principal maker and primarily liable on the notes. The cause came to trial in April, 1914, the court finding in favor of Fisher and decreeing that appellant was primarily liable on the notes and should pay them. From that judgment appellant prosecuted an appeal to the court of appeals of Ohio, where the decree of the lower court was affirmed and appellant was ordered to pay, cancel and surrender the notes held by the banks. In the meantime, on October 9, 1912, appellant filed an amended answer in each of the four attachment suits, admitting that 210 shares had been transferred on its books out of Fisher's name and stating that 1365 shares of stock stood on its books in the name of Fisher. Nothing was stated in these answers as to the information received by appellant that Fisher had sold and transferred any part of this stock. On February 28, 1913, judgment by default was entered against Fisher in the attachment suits, and appellant, as garnishee, delivered a certificate for 1365 shares of its capital stock to the sheriff of Stark county and the same was ordered to be sold. Thereafter appellees notified the sheriff that they were the owners of 1350 shares of this stock and warned him not to sell it. On May 31, 1913, the Massillon banks filed a bill in aid of the execution against Fisher and appellees. Appellant filed a cross-complaint, alleging that Fisher owed it for stock subscriptions in the identical amount sued for by the banks. On May 1, 1916, pursuant to the judgment of the court of appeals in the case of Fisher against the appellant, the judgments in the attachment suits were satisfied and the notes were taken up by appellant. No consideration was paid to the banks in this transaction other than the second preferred stock which they had received on May 15, 1912. On the same day, May 1, 1916, appellant

wrote appellees and offered to transfer to them on its books the 1350 shares of stock. This offer was refused and these suits were brought in trover for the conversion of the stock.

Two questions are presented for determination: First, was there a conversion? Second, if there was a conversion, what was the value of the stock at the time of the conversion?

Appellant takes the position that after it was summoned as garnishee in the attachment suits it acted wholly within its legal rights in refusing to transfer the stock on its books during the pendency of the attachment suits, and that as the stock during that time was *in custodia legis* there was no conversion. Appellees answer this position by first attacking the jurisdiction of the court in which the attachment suits were brought, the basis of the contention being that the affidavit in attachment was sworn to before the attorney for the plaintiff in the suit, which, under the laws of Ohio, rendered it void. Fisher filed his special appearance in the attachment suits and attacked the jurisdiction of the court, and the court expressly held in those suits that it had jurisdiction. Appellant insists that appellees cannot now raise the question of the jurisdiction of the Ohio court in this collateral proceeding, as that court had expressly passed upon the question of jurisdiction. We consider it unnecessary to discuss or determine this question, as we are clearly of the opinion that on the merits of the case the court properly found that there was a conversion of the stock. The mere statement of the facts is sufficient to determine this question. The facts clearly disclose that because of the disagreement between Fisher and the other stockholders of appellant its officers determined not only to sever Fisher's official connection with appellant but to deprive him also of his stock. As a part of its plan to accomplish this end the officers of appellant procured the Massillon banks to institute the attachment proceedings against Fisher upon claims for which it knew he was only second-

arily liable and upon which appellant was primarily liable. Having procured the institution of those suits appellant satisfied the indebtedness to the banks by transferring to them shares of its second preferred stock under an agreement with the banks that they would accept this stock in full payment of the notes and deliver up the notes at the option of appellant. From that time on the banks had no further interest in the litigation, and if anything had been recovered in the suits brought by them under their agreement with appellant, appellant, and not the banks, would have received the benefit. The whole proceeding, so far as appellant is concerned, was not only a fraud upon Fisher but was a fraud upon the court in which the attachment suits were brought. A garnishee may refuse to pay over money or property to the person to whom it is due or for whom he holds it, only upon the theory that he has the right to protect himself and to escape from incurring liability which in fairness and justice he ought not to incur. So long as he acts from this motive he will be protected in law and will not be subjected to any liability for his refusal to deliver the money or property involved to the owner. Appellant did not occupy such a position as garnishee in the attachment suits brought by the Massillon banks. It procured the bringing of each of those suits upon an indebtedness for which it was primarily liable and against which it had agreed to hold Fisher and his estate harmless. It was seeking through the banks to procure a sale of Fisher's stock for its own benefit. Under the facts disclosed by this record appellant was not justified in refusing to transfer the stock upon its books upon the demand of appellees on the ground that it had been garnisheed in the attachment suits. Appellant admittedly knew of the transfer of the stock to appellees and was therefore chargeable with knowledge of the law and as garnishee was bound to advise the court of appellees' claims. Under the facts as presented by the record appellant was guilty of a willful and malicious conver-

sion of this stock when it refused to transfer it upon its books at the request of appellees.

There is no force in the contention that the sale of the stock by Fisher to appellees was in fraud of his creditors and therefore void. It does not appear that Fisher had any creditors except the four Massillon banks, and his liability to them was secondary, only. Neither does it appear that he was without other funds or means to meet any indebtedness which he owed. In any event, in this series of litigation it has been conclusively determined that appellant was not a creditor of Fisher, and it is therefore in no position to complain on this ground.

Appellant contends that there is no evidence to support any such valuation of the stock involved as is fixed by the judgments. The proof on the part of appellant was that the stock had no market value. Appellees did not controvert that fact on the trial and now frankly concede that at the time of the conversion this stock had no market value. In arriving at the actual value of the stock appellees were permitted to prove, and the court took into consideration, the value of appellant's assets, the amount of its liabilities, and its earning power for a number of years prior to the conversion. As the stock admittedly had no market value, this was a proper method to pursue to determine the actual value of the stock. (*McDonald* v. *Danahy,* 196 Ill. 133.) In making this proof appellees introduced various balance sheets of appellant made by it before, at and after the time of the conversion of the stock, showing the financial standing of appellant and the value of its assets. We cannot weigh the testimony, as the weight to be given it has been finally determined by the Appellate Court. There is testimony fairly tending to support the judgment of the trial court fixing the value of the stock at $51 per share.

As the conversion was willful and malicious, the tender of the stock on May 1, 1916, is not available either as a defense or in mitigation of damages. *Munier* v. *Zachary,* 138

Iowa, 219; *Baltimore and Ohio Railroad Co.* v. *O'Donnell,* 49 Ohio St. 489; *Gibbs* v. *Chase,* 10 Mass. 125; *People* v. *Bank of North America,* 75 N. Y. 547.

The judgment of the Appellate Court in each case is affirmed.

*Judgments affirmed.*